UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JABRIL MUHAMMAD,

        Plaintiff,

                                     Case No.14-cv-12277

v.

                                     Paul D. Borman

LEON SKINNER, ET AL.,                 United States District Judge

        Defendants.

_____/

### OPINION AND ORDER DENYING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT (ECF NO. 39)

On June 10, 2014, Plaintiff Jabril Muhammad filed this civil rights action against ten Genesee County Sheriff Deputies: Leon Skinner, Mark Wing, Roy Eckert, Phillip Hart, Brian Compeau, Janice Buchanan, Robert Winston, Raymond Desisto, Jane Doe 1, and Jane Doe 2 ("Defendants").[1] (ECF No. 1.) Plaintiff's claims of excessive force and invasion of privacy arise from his booking into the Genesee County Jail in the early morning hours of July 16, 2011 after being arrested by the Michigan State Police.

Now before the Court is Defendants' motion for summary judgment which was filed on January 13, 2016. (ECF No. 39.) Plaintiff timely responded to the motion on February 17, 2016. (ECF No. 46.) Thereafter, Defendants filed a reply. (ECF No. 48.) Plaintiff conceded in his briefing and at the hearing that his claims are now limited only to Defendants Buchanan, Desisto, Skinner and Wing. (ECF No. 48, Pl.'s Resp., at 1.) Accordingly, the claims against Defendants Eckert, Hart, Compeau, Winston, and Jane Does 1-2 will be dismissed.

---

[1] Defendant Deputy Dixon was voluntarily dismissed on December 18, 2014. (ECF No. 31.)

The hearing on this matter was held on June 17, 2016.  For the following reasons, the Court will deny Defendants' motion for summary judgment.

## I. BACKGROUND

A.    Arrest of Plaintiff

On July 16, 2011, the Michigan State Police arrested Plaintiff for impeding traffic and for resisting arrest.  (ECF No. 39, Ex. A, Mich. St. Police Report.)  During his arrest, Plaintiff allegedly sustained a scrape on the left side of his face after he refused to obey verbal commands and was "taken down" to the sidewalk and then allegedly proceeded to deliberately hit his face on the pavement.  (*Id.*)

B.    Arrival and Booking at Genesee County Jail

Plaintiff arrived at the Genesee County Jail at approximately 2:23 am.  (Ex. F, Camera 3 Video 2:23:33-2:24:15.)  Plaintiff can be seen on video exiting the police cruiser and being escorted by five deputies into the building without any signs of noncompliance.  It is clear from the video that no force was used to remove Plaintiff from the back of the cruiser, or to escort him into the building.  (*Id.*)  This video contradicts Defendant Desisto's testimony that Plaintiff did not comply with officers while he walked into the jail.  (Pl.'s Ex. B, Desisto Dep., at 26; *see also* Def.'s Ex. I, Buchanan Dep., at 36, testifying she saw nothing on the video indicating that Plaintiff was being resistant during his walk into the jail.)

Plaintiff was then escorted by multiple deputies into the report writing room.  (Ex. F, Camera 4, 2:24:26.)  Upon entering the report writing room, Defendant Wing guided Plaintiff to a bench.  Rather than being sat on the bench, Plaintiff was maneuvered by the deputies such that he stood in front of the bench and faced the wall.  (*Id.*, at 2:24:30-33.)  Defendant Desisto

2

(wearing glasses) and Defendant Skinner then joined Defendant Wing in holding on to Plaintiff while Defendant Wing pushed Plaintiff's head flush into the wall.  (*Id.* at 2:24:34.)  Plaintiff's arms, still handcuffed, were then forced upwards while Defendant Wing removed items from Plaintiff's pockets.  (*Id.*, at 2:25:02-25).  Defendant Wing then removed Plaintiff's belt and placed it on the bench.  (*Id.* at 2:25:25-31.)

At this point, Defendants Desisto and Skinner pushed Plaintiff more forcefully against the wall.  (Camera 4, at 2:25:31-36.)  Defendant Wing then struck Plaintiff on the back of the head.  (*Id.*, at 2:25:36-37.)  Around this same time, Defendant Desisto administered two peroneal knee strikes to the back of Plaintiff's legs.  (*Id.*, at 2:25:42, 2:25:45; Desisto Dep., at 34.)  Meanwhile, Plaintiff remained pushed against the wall, handcuffed, and held by two officers. (*Id.*)

Defendant Wing then attempted to remove Plaintiff's left shoe (Camera 4, at 2:26:02-17.) It is unclear if Plaintiff was moving or being moved by Defendants as they forced his arms higher and higher behind his back.  (*Id.* at 2:26-17-24.)  Ultimately, Plaintiff's face was pushed down to the bench and his handcuffed wrists were forced against the wall above his head.  (*Id.*, at 2:26:17-29; *but see* Desisto Dep., at 35 testifying Plaintiff was not shoved into a wall and his arms were never lifted above his head.)  Plaintiff was kept in this position for nearly a minute while Defendants removed his right shoe and other possessions.  (*Id.*, at 2:26-29-2:27:13.)

Plaintiff was then turned and sat upon the bench with his back to the wall.  One of the Defendants then removed Plaintiff's earring.  (*Id.*, at 2:27:17-21.)  A women identified as Nurse Oscar then evaluated Plaintiff, who nodded in response to her questions.  (*Id.*, at 2:28:02-56; Buchanan Dep., at 46.)  At one point during Nurse Oscar's exam Defendant Skinner lifted up

3

Plaintiff's shirt.  (Camera 4, at 2:28:21.)  Plaintiff was then escorted from the report writing room to safety cell number 2: Defendant Skinner held on to Plaintiff's left arm, Defendant Wing held Plaintiff's right arm while Defendants Desisto and Buchanan followed behind.  (*Id.*, at 2:29:17-20; *see also* Pl.'s Ex. A, Video Still.)

Defendant Buchanan testified Plaintiff was "fighting" officers in the report writing room, by using other parts of his body besides his restrained hands to try to injure the officers.[2] (Buchanan Dep., at 44-45.)  Defendant Buchanan did not describe exactly how Plaintiff fought with the officers, but agreed that Plaintiff did not kick, hit, spit, tackle, head butt, or shoulder charge any officer in the report writing room.  (*Id.*)

Defendant Buchanan stated in her incident report that upon arrival at the jail Plaintiff yelled "Pull your gun out and shoot me" while pulling away from the deputies and "grabbing on to [Defendant Wing's] fingers."[3]  (Defs.' Ex. F, Incident Report, at 1; Buchanan Dep., at 77-78.) Defendant Wing testified that he heard Plaintiff's suicidal comments but could not specifically remember what those comments were.  (Wing Dep., at 27.)  Defendant Desisto, on the other hand, testified that he could not recall Plaintiff making any suicidal threats or behaving in a threatening manner while in the report writing room.  (Desisto Dep., at 36.)

Plaintiff initially testified at his deposition that he did not recall making statements, but later testified that he would not have made any suicidal statements as Defendants allege:

---

[2] Defendant Buchanan testified she had no independent recollection of this incident; her testimony was based on her review of the video.

[3] It is unclear from the Incident Report if Plaintiff is alleged to have made the suicide threat upon his arrival to the Genesee County Jail or whether Plaintiff made the statement when he arrived at the report writing room.

4

Q.      Okay.  You don't remember saying anything, okay.  So if people heard
        you say that, you just don't – you just don't remember?

A.      Right.

Q.      Okay.

A.      Because I know I didn't say anything.  When I got out of the car, I just had
        my head down.

Q.      Okay. You don't think you said anything, is that what you're telling me?

A.      Right.

Q.      You don't think you said anything when you got out of that state police
        car that night?

A.      Right.

Q.      Nothing at all?

A.      Nothing. Nothing.

Q.      Nothing. All right.  So if other people heard you say shoot me, kill me,
        you would deny that, that you said that, is that what you are telling me?

A.      Yeah, because I wouldn't say nothing like that.

(Muhammad Dep., at 60-61.)

Plaintiff, still handcuffed, is then escorted from the report writing room while surrounded by Defendants Wing, Skinner, and Desisto.  At this time, Plaintiff was not dragged or pushed by Defendants, but walked under his own power through a vestibule and at least two hallways. (Camera 5, 2:29:18-27; Camera 7, 2:29:27-30, Camera 8, 2:29:28-35; Camera 9, 2:29:35-45). Contrary to Defendant Wing's testimony that Plaintiff was "twisting" and "pulling" and refused to "walk on his own," Plaintiff cannot be seen on video resisting or fighting while being escorted to the "safety cell."  (*Id.*, Buchanan Dep., at 50; *cf.* Wing Dep., at 49-50.)

5

On the way to the "safety cell," a second female deputy, Laurissa Cocking, joined the procession behind Defendant Buchanan.  (Camera 8, 2:29:40; Buchanan Dep., at 52, identifying Deputy Cocking.)  As Plaintiff and Defendants filed into the "safety cell," Deputy Cocking remained in the doorway looking inside the cell.  (Camera 9, 2:29:45- 2:30:43.)  Nurse Oscar then joined Deputy Cocking looking into Plaintiff's open cell.  (*Id*., at 2:30:43-46.)

C.       "Safety Cell" No. 2

While Deputy Cocking and Nurse Oscar remained in the doorway, Plaintiff was escorted into "safety cell" number 2.  (Camera 12, 2:29:43.)  Plaintiff, with his hands still handcuffed behind his back, was led to the back wall of the cell while surrounded by Defendants Wing, Desisto, and Skinner.  (*Id*.)  All three Defendants appeared to be physically touching Plaintiff as they reached the rear of the cell.  (*Id*.)  Approximately four seconds elapsed from the time Plaintiff entered the cell until Defendant Wing kicked Plaintiff's legs out from underneath him, and forced Plaintiff face first to the ground.  (*Id*., 2:29:43-46.)  Meanwhile, Defendant Buchanan stood in the cell, facing Plaintiff, with her back to the camera and her taser in her left hand.  (*Id*.)

While Plaintiff lay face down on the ground, Defendants Wing, Desisto, and Skinner held him down, and Defendant Desisto stepped on Plaintiff's right ankle.  (*Id*., at 2:29:52.)  Plaintiff's pants were then stripped down to his ankles.  (*Id*., at 2:29:49-2:30:01.)  At that time, Defendant Wing was standing at Plaintiff's head, Defendant Skinner was next to Plaintiff's left arm, and Defendant Desisto was at Plaintiff's ankles.  (*Id*.)  Defendant Skinner then removed the handcuff keys from his pocket or belt (*id*., 2:30:03-06) and leaned down to unlock Plaintiff's handcuffs with the help of Defendant Wing.  (*Id*., at 2:30:03-42.)  While not completely clear, Plaintiff did not appear to grab at Defendants while the cuffs were removed.  (*Id*.)

6

The now unhandcuffed Plaintiff continued to lay on the ground motionless while Defendant Desisto held his legs down with the weight of his body and removed Plaintiff's pants from his ankles.  (Camera 12, at 2:31:03-20.)  Defendant Wing and Defendant Skinner held on to Plaintiff by his elbows and Defendant Wing manipulated Plaintiff's right arm, apparently in an attempt to remove Plaintiff's shirt.  (*Id.*, at 2:31:08-16.)  Defendant Buchanan then stepped in front of the camera which obscured the view of Plaintiff.  (*Id.*, at 2:31:28.)  A few moments later, both Defendants Wing and Skinner hunched down over Plaintiff's upper torso and head, but the nature of their movements were blocked from the camera by Defendant Buchanan body.  (*Id.*, at 2:31:40-51.)  Defendant Desisto, however, was visible at that time, kneeling on the backs of Plaintiff's knees while holding on to Plaintiff's ankles and his right leg.  (*Id.* at 2:31:46-49; 2:32:03.)

At this point, Defendant Buchanan stepped to her right allowing a clear view of Plaintiff, but Defendant Skinner's actions continued to be obscured from the camera by Defendant Wing's body; Defendants Wing and Skinner continued to be huddled and moving over Plaintiff's head in the corner of the cell.  (Camera 12, at 2:32:04.)  A few moments later, Plaintiff's shirt was removed and thrown clear to the corner of the cell.  (*Id.*, at 2:32:18.)

Meanwhile, Nurse Oscar remained in the doorway watching while Deputy Cocking briefly left but then returned with a handheld radio.  (Camera 9, 2:30:59-2:31:49).  Deputy Cocking then briefly entered Plaintiff's cell and retrieved Plaintiff's discarded clothes (Camera 12, 2:32:20-23) and then resumed her position with Nurse Oscar watching Plaintiff in the cell from the doorway.  (Camera 9, at 2:32:20-31.)

While Deputy Cocking retrieved Plaintiff's clothes, Defendant Desisto began to remove Plaintiff's underwear.  (Camera 12, 2:32:20-27.)  Before the underwear was clear of Plaintiff's legs, Defendant Buchanan removed a piece from her taser (*id.*, at 2:32:26), and stepped forward and applied the taser to Plaintiff's naked lower back for approximately five seconds (*id.*, at 2:32:27-39).

Plaintiff, still face down, was then maneuvered into a spread eagle pose as Defendant Desisto fully removed Plaintiff's underwear and threw the underwear towards the cell door.  (*Id.* at 2:32:44-46.)  Next, Defendant Desisto stood and placed his foot down near or on Plaintiff's right ankle for a moment.  (*Id.*, at 2:32:58.)  At that time, Defendant Buchanan exited the cell and an unidentified male officer entered the cell and placed *his* foot on Plaintiff's right ankle for approximately 25 seconds.  (*Id.*, at 2:32:54-2:33:17.)  During that time, Defendants Skinner and Wing were obscured from view but can been seen crouched over the Plaintiff's naked head and torso.  (*Id.*)

Then, while the officers exited Plaintiff's cell, Deputy Cocking retrieved and threw the suicide garb into Plaintiff's cell.  (Camera 9, 2:33:17-30; Camera 12, 2:33:17-25.)

Plaintiff was left alone, naked, and unmoving on his stomach with part of his torso on the raised portion of the cell floor and his left arm bent behind his back at an awkward angle.  Plaintiff did not move from that position for more than three minutes.  (Camera 12, 2:33:20-2:36:48.)  Plaintiff's testimony was not contradicted by the video.

Plaintiff testified that he was never told to get to his knees upon entering the cell and also denied struggling against Defendants while in the cell.  (Muhammad Dep., at 72-73.)  Plaintiff further testified that the "lady with the red hair" said nothing to him prior to the tasing nor after.

(*Id.*, at 63.)  Plaintiff stated: "What I remember when she taser me, I was screaming out, stop, stop, stop and I felt my clothes coming off me."  (*Id.*, at 63-64.)  Plaintiff also claimed that Defendants punched him in the face while he was on the ground in the cell and that he lost consciousness after the tasing.  (*Id.*, at 64-65; 68-69.)

Defendant Buchanan testified at her deposition that she had no independent recollection of the incident.  (Buchanan Dep., at 23.)   In a report she authored shortly after the event, however, Defendant Buchanan stated that she had used her taser to gain compliance over Plaintiff after he refused direct orders by staff to kneel down and then actively resisted deputies by "attempting to pull away."[4]  (Defs.' Ex. F, Buchanan Report at 1-2, PGID 261-62.) Additionally, Defendant Buchanan created a report regarding the "Use of Less-than-Lethal Force" in which she stated that Plaintiff was actively resisting staff.  (*Id.* at PGID 263.)  Finally, Defendant Buchanan testified that it was procedure to order prisoners not to move when leaving the cell, and she reasoned this was why Plaintiff remained motionless after the officers left the cell.  (Buchanan Dep., at 67.)

Defendant Wing testified that he removed Plaintiff's handcuffs in the cell and that Plaintiff was noncompliant during that process and was "pulling trying to roll, kicking his feet, grabbing ahold of my wrist."  (Wing Dep., at 29.)  Defendant Wing also stated in his incident report that Plaintiff grabbed his wrist while he was being uncuffed and the taser was used to gain compliance.  (Ex. F, Reports, at PGID 264.)  Additionally, Defendant Wing stated that Plaintiff was "placed into garb due to his suicidal statements."  (*Id.*)

---

[4] The Court notes that the reports authored by Defendants are largely illegible due to the quality of the print.  Therefore, the Court only relies upon those portions can be deciphered.

9

Defendant Skinner's report set forth that Plaintiff failed to comply with an order to kneel and "instead continued to resist" and then became "even more aggressive" when the staff tried to remove his handcuffs and Plaintiff "tried to fight staff" so the taser was used to "gain compliance."  (*Id*. at PGID 265.)

Defendant Desisto similarly stated in his report that Plaintiff failed to follow instructions when entering the cell and while he was uncuffed he "attempted to bring leg up in assaultive manner resulting in R/O restraining legs."  (*Id*. at PGID 266.)  Defendant Desisto noted that Plaintiff grabbed at staff which resulted in the taser being deployed.  (*Id*.)

D.      Subsequent Proceedings

Plaintiff remained at the jail until his bond was posted the next day, July 17, 2011.  (Pl.'s Resp., Ex. P., Inmate Record.)  Thereafter, Plaintiff was convicted by a jury of obstructing and resisting a Michigan State Police Trooper.  (*See e.g.*, Ex. H, Jury Tr. Trans.)  Plaintiff was not charged with or convicted of a crime regarding his interactions with Defendants on July 16, 2011 at the Genesee County Jail.

## II. STANDARD OF REVIEW

Defendants moved for summary judgment under Rule 56(a) of the Federal Rules of Civil Procedure.  This rule provides that summary judgment "should be rendered if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  FED. R. CIV. P. 56(a).  Summary judgment is appropriate where the moving party demonstrates that there is no genuine issue of material fact as to the existence of an essential element of the nonmoving party's case on which the nonmoving party would bear the burden of proof at trial.  *Celotex*

*Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  "Of course, [the moving party] always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of genuine issue of material fact."  *Id*. at 323; *see also Gutierrez v. Lynch*, 826 F.2d 1534, 1536 (6th Cir. 1987). However, in making this evaluation, the court must examine the evidence and draw all reasonable inferences in favor of the non-moving party.  *Bender v. Southland Corp.*, 749 F.2d 1205, 1210-11 (6th Cir. 1984).

The Supreme Court addressed the role of video evidence in the evaluation of a motion for summary judgment in *Scott v. Harris*, 550 U.S. 372 (2007).  The Sixth Circuit has summarized the implications of the *Scott* decision:

> *Scott's* holding is twofold.  First, *Scott* stands for the proposition that witness accounts seeking to contradict an unambiguous video recording do not create a triable issue.  [*Scott*,] at 380-81.  Second, *Scott* reaffirmed the holdings of *Matsushita* and *Anderson* that, in disposing of a motion for summary judgment, a court need draw only *reasonable inferences* in favor of the nonmoving party; it need not construe the record "in such a manner that is wholly unsupportable – in the view of any reasonable jury – by the video recording." ...  This court has also clarified that there is "nothing in the *Scott* analysis that suggests that it should be restricted to cases involving videotapes."  *Coble v. City of Whitehouse, Tenn.*, 634 F.3d 865, 868 (6th Cir. 2011).

*Shreve v. Franklin Cnty, Ohio*, 743 F.3d 126, 132-33 (6th Cir. 2014) (internal citation omitted) (emphasis added); *see also Rudlaff v. Gillispie*, 791 F.3d 638, 639 (6th Cir. 2015) (explaining that where the record includes a police dash-cam video depicting all of the genuinely disputed facts the court must "view[] the facts in the light depicted by the videotape[s]." (citations omitted)).

11

III. ANALYSIS

A.      Qualified Immunity for Excessive Force Claim

Defendants argue that they are entitled to qualified immunity on Plaintiff's Fourth

Amendment claims of excessive force.  The doctrine of qualified immunity generally protects

"government officials performing discretionary functions ... from liability for civil damages

insofar as their conduct does not violate clearly established statutory or constitutional rights of

which a reasonable person would have known."  *Harlow v. Fitzgerald*, 457 U.S. 800, 818

(1982).  The purpose of qualified immunity is to "shield the official from suit altogether, saving

him or her from the burdens of discovery and costs of trial."  *Mitchell v. Forsyth*, 472 U.S. 511,

526 (1985).  This doctrine protects government officials from civil liability unless, "in the course

of performing their discretionary functions, they violate the plaintiff's clearly established

constitutional rights."  *Jones v. Byrnes*, 585 F.3d 971, 974 (6th Cir. 2009).

A government official is entitled to qualified immunity "unless a plaintiff pleads facts

showing: "(1) that the official violated a statutory or constitutional right and (2) that the right

was 'clearly established' at the time of the challenged conduct."  *Ashcroft v. al-Kidd*, --- U.S. ---

, 131 S. Ct. 2074, 2080 (2011) (citation omitted).  The order of the inquiry is no longer

mandatory and courts may use their discretion in deciding which of the two steps of the qualified

immunity analysis should be addressed first.  *Id.* (citing *Pearson v. Callahan*, 555 U.S. 223, 236

(2009)).  Once a government official has raised the defense of qualified immunity, plaintiff bears

the burden to demonstrate that the defense is unwarranted.  *Roth v. Guzman*, 650 F.3d 603, 609

(6th Cir. 2007).  A constitutional right is clearly established when "it would be clear to a

reasonable officer that his conduct was unlawful in the situation he confronted."  *Saucier v. Katz*,

12

533 U.S. 194, 201 (2001). "But under either prong, courts may not resolve genuine disputes of fact in favor of the party seeking summary judgment." *Tolan v. Cotton*, --- U.S. ---, 134 S. Ct. 1861, 1866 (2014).

    1.    Constitutional Violation

Plaintiff first claims that his Fourth Amendment rights were violated when Defendants used excessive force against him when Defendants Wing, Skinner, and Desisto beat him and stepped on him and Defendant Buchanan tasered him while he was being stripped naked in a safety cell. In order to make a claim pursuant to 42 U.S.C. § 1983, a plaintiff must establish a violation of an existing constitutional right by a person acting under color of state law.[5] *Flagg Bros., Inc. v. Brooks*, 436 U.S. 149, 155 (1978); *Waters v. City of Morristown*, 242 F.3d 353, 358-59 (6th Cir. 2001). Section 1983, however, does not confer any substantive rights but rather affords a means to "vindicate rights conferred by the Constitution or laws of the United States." *Aldini v. Johnson*, 609 F.3d 858, 864 (6th Cir. 2010). Thus, "[i]n addressing an excessive force claim brought under § 1983, analysis begins by identifying the specific constitutional right allegedly infringed by the challenged application of force." *Id.* (quoting *Graham v. Connor*, 490 U.S. 386, 394 (1989)).

Despite Defendants' arguments to the contrary, it is well settled that the Fourth Amendment's protections extend through the booking process. The Sixth Circuit has explained that "[t]he Fourth Amendment of the United States Constitution protects a person from being subjected to excessive physical force during the course of an arrest, a booking, or other police

---

[5] In the present case, it is undisputed that the Defendants were operating under the color of state law.

13

seizure." *Malory v. Whiting*, 489 F. App'x. 78, 81 (6th Cir. 2012) (citing *Drogosch v. Metcalf*, 557 F.3d 372, 378 (6th Cir. 2009)).  In *Aldini*, the Sixth Circuit found that the "dividing line between the Fourth and Fourteenth Amendment zones of protection" is set at the probable cause hearing and therefore, a claim arising from a beating and tasing that took place "in the middle of the booking procedure" was governed by the Fourth Amendment.  *Id.*, 609 F.3d at 867; *see also Clay v. Emmi*, 797 F.3d 364, 369 (6th Cir. 2015) (holding that in the wake of the Supreme Court's decision in *Kingsley v. Hendrickson*, --- U.S. --- , 135 S.Ct. 2466 (2015), "a pretrial detainee's excessive force claim brought under the Fourteenth Amendment's Due Process Clause is subject to the same objective standard as an excessive force claim brought under the Fourth Amendment.").  Similar to *Aldini*, in the present action, the interaction between Plaintiff and Defendants happened during the booking process and prior to a probable cause hearing.  Thus, it was clearly established law at the time of this incident that the Fourth Amendment standard "zone of protection" applied to any excessive force claim that arose during the booking process.

"Under the Fourth Amendment, [courts] apply an objective reasonableness test, looking to the reasonableness of the force in light of the totality of the circumstances confronting the defendants, and not to the underlying intent or motivation of the defendants." *Burgess v. Fischer*, 735 F.3d 462, 472 (6th Cir. 2013) (citing *Dunigan v. Noble*, 390 F.3d 486, 493 (6th Cir. 2004)); *see also Graham*, 490 U.S. at 396-97.  Three factors guide a court's analysis in this inquiry: "the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Martin v. City of Broadview Heights*, 712 F.3d 951, 958 (6th Cir. 2013) (citing *St. John v. Hickey*, 411 F.3d 762, 771 (6th Cir. 2005)); *see also Graham*, 490 U.S. at 396.  This

inquiry must also be "assessed from the perspective of a reasonable officer on the scene making a split-second judgment under tense, uncertain, and rapidly evolving circumstances without the advantage of 20/20 hindsight." *Burgess*, 735 F.3d at 473 (citing *Graham*, 490 U.S. at 396-97); *accord Burchett v. Kiefer*, 310 F.3d 937, 944 (6th Cir. 2002). Moreover, a court must balance "the nature and quality of the intrusion on [a plaintiff's] Fourth Amendment interests against the countervailing governmental interests at stake." *Ciminillo v. Streicher*, 434 F.3d 461, 466-67 (6th Cir. 2006).

Taking the facts in a light most favorable to Plaintiff, including the video, the Court finds that Plaintiff has established a violation of his Fourth Amendment rights. Indeed, all three of the *Graham* factors weigh in favor of finding Defendants' use of force was objectively unreasonable. While Plaintiff had been initially arrested by the Michigan State Police for impeding traffic and resisting arrest by failing to follow verbal orders, Plaintiff's noncompliant or aggressive nature at the time of his earlier arrest, while noted by the Court, does not weigh in Defendants' favor. *See Burgess*, 735 F.3d at 475 (citing with approval, *Feemster v. Dehntjer*, 661 F.2d 87, 89 (8th Cir. 1981) ("No matter how difficult it is to apprehend a prisoner, the law does not permit officers to beat him once he is in custody.")). Rather, Plaintiff's actions in the video are consistent with his testimony of compliance and nonresistance.

Moreover, Plaintiff was not an immediate threat to Defendants or others at the time he was stripped in the "safety cell." Plaintiff was searched prior to being led to the safety cell and was confirmed to be unarmed. Defendants offered differing testimony regarding when and whether Plaintiff resisted their efforts by grabbing Defendant Wing's wrist during the cuff removal or kicking out during that time. Yet, viewing the video and testimony in a light most

15

favorable to Plaintiff, it is unclear whether Plaintiff ever kicked or grabbed at Defendants.

Further, Plaintiff was under the physical control of three Defendant officers at all times while in

the "safety cell" and cannot be seen to stand, struggle, or kick while restrained on the ground.

Rather, Plaintiff lay with his face on the ground, where he landed after being kicked there by

Defendant Wing, while the Defendants Wing, Skinner, and Desisto forcibly stripped him naked,

Defendant Buchanan tased him, and Defendant Desisto stepped on him.  Plaintiff appeared

unconscious.  Whether Plaintiff posed a risk to himself is a genuine issue of material fact.

Plaintiff disputes he was suicidal or that he made any threats of that nature.  Plaintiff did not

pose a flight risk, nor is there anything in the video that evidences that Plaintiff attempted to

obstruct or flee.

Defendant's arguments for summary judgment on the excessive force claim are

unsupported and unpersuasive.  To wit, Defendants misconstrue and misrepresent Plaintiff's

deposition testimony regarding the incident as inconsistent and contradictory.  Read as a whole,

however, Plaintiff testified that he denied making suicidal threats, he denied being given

directions upon entry to the cell, and denied resisting the Defendants.  (Muhammad Dep., at 61,

63-64.)  Moreover, even if Plaintiff's testimony regarding his memory of the events was

inconsistent, the Sixth Circuit has held that a plaintiff's inconsistent testimony can establish

genuine issues of material fact because such inconsistencies go to the credibility of the witness

and not the admissibility of the testimony.  *Schrieber v. Moe*, 596 F.3d 323, 333 (6th Cir. 2010)

(acknowledging that the plaintiff's testimony was contradictory and "inconsistent both with itself

and with his prior statements" but "emphasize[d], however, that 'in reviewing a summary

judgment motion, credibility judgements and weighing of the evidence are prohibited.").

Defendants' representations regarding Plaintiff's trial testimony are similarly misleading and irrelevant because Plaintiff was being questioned solely regarding his earlier interaction with the Michigan State Police and the injuries he sustained at that time.  (Defs.' Ex. H, at 243.)

Defendants' statements regarding what can and cannot be established by viewing the video are merely hyperbole.  Despite including the videos of the event as an exhibit to their motion, Defendants fail to identify the points in time on the videos where Plaintiff actively resists or "fights" Defendants, and merely cite generally to the entire exhibit without any reference to the camera or the time frame.  This failure to cite to the videos with any particularity is especially egregious in light of the fact that Defendants argue that these videos blatantly contradict Plaintiff's version of the events and show "Plaintiff resisting and being aggressive towards the Deputies and documents the lack of excessive force given the active resistance by Plaintiff. (Ex. E)."  (Defs.' Br., at 16.)

Despite Defendants' unsupported arguments to the contrary, the videos do not blatantly contradict Plaintiff's version of the events or his testimony that he was compliant and was struck in the head, stepped on, and tased without warning.  Further, the videos do not resolve the genuine issue of material fact regarding whether Defendants Skinner, Desisto, and Wing struck Plaintiff in the face, because there were periods of time when Defendants Skinner, Desisto, and Wing were crouched over Plaintiff's head and upper torso but the video view of their actions was obscured.  Given these facts, the Court concludes that Plaintiff has established a genuine issue of material fact regarding whether Defendants violated his Fourth Amendment rights when Defendant Buchanan tased him, when Defendants Wing, Skinner, and/or Desisto beat him in the head, and when Defendant Desisto stood on Plaintiff's ankle while Plaintiff was restrained face

17

down on the ground by three officers and compliant.

     2.    Clearly Established

Defendants may still be entitled to summary judgment if they can establish that Plaintiff's Fourth Amendment rights were not clearly established at the time of this incident. "In evaluating whether a constitutional right was clearly established, 'the key determination is whether a defendant moving for summary judgment on qualified immunity ground was on notice that his alleged actions were unconstitutional.'" *Stoudemire v. MDOC*, 705 F.3d 560, 567 (6th Cir. 2013) (quoting *Grawey v. Drury*, 567 F.3d 302, 313 (6th Cir. 2009)). To this end, the "contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates the that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987). In determining whether a constitutional right is clearly established, "the Supreme Court has 'repeatedly' warned lower courts not to define the right at 'a high level of generality.'" *Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 508 (6th Cir. 2012) (quoting *al-Kidd*, 131 U.S. at 2084). The Sixth Circuit has instructed courts to strive for "an appropriate middle ground" when defining the constitutional right that is neither too general, nor too factually narrow. *Id*. at 508-09.

Here, the appropriate inquiry is whether it was clearly established in July 2011, that hitting, stepping on, or tasing a neutralized and restrained pretrial detainee constituted excessive force in violation of the Fourth Amendment. The Court concludes that such a right was clearly established in July 2011because the Sixth Circuit had recognized in 2006 that it had held "repeatedly that the use of force after a suspect as been incapacitated or neutralized is excessive as a matter of law." *Baker v. City of Hamilton, Ohio*, 471 F.3d 601, 607 (6th Cir. 2006) (collecting authority); *see also Phelps v. Coy*, 286 F.3d 295, 301-02 (6th Cir. 2002) (recognizing

that "there was simply no governmental interest in continuing to beat [plaintiff] after he had been neutralized, nor could a reasonable officer have thought there was."); *Morrison v. Bd. of Trustees of Green Twp.*, 583 F.3d 394, (6th Cir. 2009) (finding that it was clearly established as of 2002 that pushing the face of a suspect into the ground in the absence of a threat to officer safety constituted excessive force).

Given the case law cited *supra*, and viewing all the facts and the video evidence in a light most favorable to Plaintiff, the Court finds that every reasonable officer in Defendants' positions would have been aware in July 2011 that tasing, beating, or stepping on a neutralized and restrained pretrial detainee constituted excessive and gratuitous force. Accordingly, the Court will deny Defendants' claims of qualified immunity on Plaintiff's claims of excessive force.

B.      Right to Privacy Claim

Plaintiff also alleges that Defendants violated his Fourth Amendment right to privacy pursuant to 42 U.S.C. § 1983 by forcibly stripping him in front of female staff: Defendant Buchanan, Deputy Cocking, and Nurse Oscar.

The Fourth Amendment guarantees pretrial detainees a limited privacy interest. *Bell v. Wolfish*, 441 U.S. 520, 558 (1979); *Stoudemire v. MDOC*, 705 F.3d 560, 571-72 (6th Cir. 2013); *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992); *Kent v. Johnson*, 821 F.2d 1220, 1227 (6th Cir. 1987). The Sixth Circuit examined the constitutional framework for such a claim in the context of convicted prisoners in *Stoudemire v. MDOC*, 705 F.3d 560 (6th Cir. 2013):

> Because "the difficulties of operating a [prison] must not be underestimated by the courts," *Florence v. Bd. of Chosen Freeholders of Cnty. of Burlington*, ---U.S. ---, 132 S.Ct. 1510, 1515, 182 L.Ed. 2d 566 (2012), we review a prisoner's constitutional claims under a standard that affords deference to the judgments of correctional officers, "who must have substantial discretion to devise reasonable solutions to the problems they face." *Id.*; *see also Flagner v. Wilkinson*, 241 F.3d

19

475, 481 (6th Cir. 2001). A prison's regulations need only be "reasonably related to legitimate penological interests." *Turner v. Safley*, 482 U.S. 78, 89, 107 S.Ct. 2254, 96 L.Ed.2d 64 (1987). We review a correctional officer's discretionary actions under essentially the same deferential standard. *Florence*, 132 S.Ct. at 1516. But we must not confuse deference with abdication: "[F]ederal courts must take cognizance of the valid constitutional claims of prison inmates." *Turner*, 482 U.S. at 84, 107 S.Ct. 2254. As we have noted, "a convicted prisoner maintains some reasonable expectations of privacy while in prison ... even though those privacy rights may be less than those enjoyed by non-prisoners." *Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir.1992); *see also Hutchins v. McDaniels*, 512 F.3d 193, 196 (5th Cir.2007) ("[T]he Fourth Amendment protects prisoners from searches and seizures that go beyond legitimate penological interests. Searches of prisoners must be conducted in a manner that is reasonable under the facts and circumstances in which they are performed." (internal citation omitted)).

*Stoudemire*, 705 F.3d at 571-72. Accordingly, the framework for evaluating a pretrial detainee's Fourth Amendment privacy claim requires a court to evaluate "the scope, manner, and location of the search – as well as the justification for initiating it – in order to assess the degree to which it invaded the prisoner's right to privacy." *Id.*, at 572 (citing *Florence*, 132 S.Ct. at 1516).

Defendants include three sentences addressing this claim in the conclusion of their motion for summary judgment. (*See* Defs.' Br., at 17.) Defendants cite no law and make no argument beyond stating that "[n]o law exists indicating that it is unconstitutional for a command officer to not supervise suicide prevention efforts related to an inmate." (*Id.*). Defendants go on to address this claim in a slightly more in-depth manner in their reply, arguing that Plaintiff's privacy claim fails because Plaintiff did not set forth a claim against Genesee County based on an unconstitutional policy and because suicide prevention justified the forcible stripping in front of female staff. (Defs.' Reply, at 4-5.) Defendants also claim that "[a]ny claim regarding a nurse or Deputy Cocking being present has not been plead as they are not parties." (Defs.' Reply, at 4.) It is unclear from Defendants' briefing if they are asserting the defense of qualified immunity on this claim.

20

Defendants' arguments that summary judgment is appropriate on Plaintiff's right to privacy claim are vague and unsupported by case law. Defendants rely upon the wrong framework for analyzing the claim and therefore fail to analyze the scope, manner, location, and justification of Plaintiff's forcible stripping. Defendants also appear to labor under the misapprehension that Plaintiff's claim cannot be sustained against individual officers. *See Stoudemire*, 705 F.3d at 570-72 (addressing right to privacy claim against an individual officer for her involvement in the forcible stripping of the plaintiff prisoner.)

Taking the evidence in a light most favorable to Plaintiff, it is clear that Plaintiff was forcibly stripped naked by the three male Defendant officers in an open cell under the supervision of Defendant Buchanan, a female sergeant. Additionally, two female staff members uninvolved in the stripping of Plaintiff watched the entire episode from the doorway of the open cell. Plaintiff was not instructed nor afforded an opportunity to take off his own clothes before Defendants Wing, Skinner, and Desisto began to strip him in the cell. Plaintiff, who was apparently rendered unconscious during the stripping, was left naked and lying on the floor while a suicide garment was thrown near him. Defendants' only justification for Plaintiff's forcible stripping are suicide threats that Plaintiff denies ever making. But even if it was appropriate for male deputies to view Plaintiff's disrobing and the provision of a safety garment, it neither justified their forcible conduct, nor the presence of female deputies.

The location of the stripping further amplified the intrusion in this case because Plaintiff was stripped in an open cell while three female staff members watched. *Stoudemire*, 705 F.3d at 573 (noting the "obvious" fact that "a strip search is more invasive when it is performed where other people can see the person being stripped." (citation omitted)). Indeed, any privacy that the

safety cell could or should have afforded was obviated by the fact the door was left open such that people could and did in fact watch Plaintiff be forcibly stripped naked.

The manner in which Plaintiff was stripped, as captured on video, was also extremely invasive and weighs in favor of the denial of summary judgment. Plaintiff was kicked to the ground almost immediately upon entry to the safety cell, and he was never asked or afforded an opportunity by Defendants to strip off his own clothes in private. Moreover, Defendants Skinner, Wing, and Desisto physically touched and manipulated Plaintiff's body to forcibly remove his clothes. *See Mead v. Cnty. of St. Joseph*, No. 1:06-cv-555, 2008 WL 441129, *3 (W.D. Mich. Feb. 13, 2008) (finding the manner of a strip search that left a woman clad only in her underwear and a suicide garb weighed in favor of denying summary judgment where the strip search was "conducted by force and without affording Plaintiff any opportunity to avoid exposing herself to Defendants."); *Williams v. City of Cleveland*, 771 F.3d 945, 955 (6th Cir. 2014) (recognizing that "strip searches would be even more humiliating if, instead of giving detainees a chance to remove their own clothing, corrections officials simply did it for them.").

The Court concludes that Defendants' proffered justifications for stripping Plaintiff in the presence of female staff also weigh in favor of denying summary judgment. Defendants contend that they were justified in forcibly stripping Plaintiff because he was a suicide risk and Defendant Buchanan was required to be present for his forcible stripping because she was the sergeant on duty that night. Yet, Defendants' claim that Defendant Buchanan was required to be present does not address the fact that two other female staff members were present and watched the entire process from the cell's open door. Moreover, whether Defendant Buchanan was required to be present for the stripping remains an issue of material fact because Defendants did

22

not cite or produce any official policy or procedure regarding such a rule, and her own testimony

indicated that a male sergeant might violate the policy by supervising the stripping of a suicidal

female prisoner.[6]  Most significantly, however, Plaintiff testified that he did not make any

suicide threats and therefore whether such threats could justify a forcibly stripping remains an

issue of material fact that must be resolved by a jury.  *See Mead*, No. 1:06-cv-555, 2008 WL

441129, at *3 (finding that "opposite-sex officers who strip a person- even an allegedly suicidal

detainee–of her clothes and bra without affording her the opportunity to change in private violate

the person's Fourth Amendment right to privacy."); *see also Kent*, 821 F.2d at 1227 (assuming

that "there is some vestige of the right to privacy retained by state prisoner and that this right

protects them from being forced unnecessarily to expose their bodies to guards of the opposite

sex.").

---

[6] Defendant Buchanan testified in relevant part:

A:    We use female officers with female inmates.
Q.    Is that pursuant to a policy?
A.    It's no given policy that I've written or know that it does or does not exist,
      but we give every – in each instance females will handle females and
      males will handle males.  In Mr. Muhammad's situation I'm the sergeant.
Q.    Uh-huh.
A.    It's my responsibility –
Q.    Uh-huh.
A.    – to be there.
Q.    So hypothetically if you were a male sergeant and Mr. Muhammad was
      Mrs. Muhammad, would you have then stayed in the cell while he was
      being  – she was being stripped of her clothing?  In other words, would
      that be a violation of the policy at the jail?
A.    Depending on the situation.

(Buchanan Dep., at 60-61.)

Thus, considering the scope, manner, location, and justification of the forcible stripping of Plaintiff in full view of opposite-sex staff members, the Court will deny Defendants' request for summary judgment where genuine issues of material fact exist as to whether Defendants violated Plaintiff's Fourth Amendment right to privacy by participating in the aforementioned stripping.

As noted above, it is unclear whether Defendants have asserted the defense of qualified immunity as to this claim. To the extent that Defendants's briefing could be construed to assert this defense, the Court finds it without merit because a pretrial detainee's right to privacy against forced exposure to members of the opposite sex was clearly established in July 2011 and every reasonable officer in Defendants' positions would have understood his or her conduct violated that right. *See Cornwell*, 963 F.3d at 916; *Stoudemire*, 705 F.3d at 570-72.

## IV. CONCLUSION

For all these reasons, the Court DENIES Defendants' Motion for Summary Judgment (ECF No. 39). The Court also DISMISSES with PREJUDICE Defendants Eckert, Hart, Compeau, Winston, and Jane Does 1-2 from this action.

IT IS SO ORDERED.

s/Paul D. Borman
PAUL D. BORMAN
UNITED STATES DISTRICT JUDGE

Dated: June 24, 2016

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served upon each attorney or party of record herein by electronic means or first class U.S. mail on June 24, 2016.

s/Deborah Tofil
Case Manager